**REISSUED FOR PUBLICATION**
**OCT 25 2018**
**OSM**
**U.S. COURT OF FEDERAL CLAIMS**

# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * *
SAMUEL WEBB,                      *
                                 *      No. 15-803V
                                 *
              Petitioner,        *      Special Master Christian J. Moran
                                 *
v.                               *
                                 *      Filed: September 27, 2018
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *      Entitlement; dismissal; flu vaccine;
                                 *      Bell's palsy.
              Respondent.        *
* * * * * * * * * * * * * * * * * *
```

Samuel Webb, Pro Se;
Justine Walters, United States Dep't of Justice, Washington, D.C., for respondent.

### UNPUBLISHED DECISION GRANTING RESPONDENT'S MOTION FOR DISMISSAL[1]

Samuel Webb filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10 through 34 (2012), on July 29, 2015. His original petition alleged that the flu vaccine he received on November 20, 2012, caused him to develop Bell's palsy on the left side of his face. However, the medical records obtained and filed in the years following the filing of his original petition have not

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

been consistent with Mr. Webb's allegation. Mr. Webb was provided an opportunity to amend his petition to correct these issues. In his amended petition, Mr. Webb claimed that the flu vaccine caused him to suffer from an anaphylactic reaction, which caused an acute onset of total facial paralysis on the left side of his face and other conditions. In response to the amended petition, the Secretary filed an amended Rule 4(c) report, stating that there remains an absence of corroborating medical records or opinion supporting the claim for compensation. The Secretary also moved for dismissal of Mr. Webb's petition. For the reasons stated below, the Secretary's motion is GRANTED and Mr. Webb's petition for compensation is DISMISSED.

## I.   **Procedural History**

Represented by attorney Andrew Downing, Mr. Webb originally alleged that the seasonal flu vaccine, administered on November 20, 2012, caused him to experience facial nerve paralysis, facial palsy, and pain on the left side of his face. Pet. at ¶ 35. The petition refers to this constellation of symptoms as being consistent with Bell's palsy. Id. at ¶ 35. Bell's palsy is a unilateral facial paralysis that is characterized by a sudden onset. Dorland's Medical Dictionary 1365 (32d ed. 2012). The palsy is due to damage to the facial nerve. Id.

After Mr. Webb filed his petition, the undersigned set a deadline of September 4, 2015, for him file any outstanding medical records, affidavits, and a statement of completion. Order, issued Aug. 4, 2015. The undersigned also suspended the deadline for respondent's Rule 4(c) report while the petitioner continued to submit the required documentation. Id.

Over the course of the subsequent months, Mr. Webb filed five different motions for an enlargement of time to file the required medical records and affidavits. These requests were granted and petitioner ultimately filed his statement of completion on January 19, 2016. During this period, Mr. Webb filed an affidavit that stated that he continued to try to, unsuccessfully, arrange an evaluation by a neurologist. See exhibit 8 at ¶ 6. On March 21, 2016, the Secretary confirmed that the records appeared largely complete and on April 20, 2016, he filed his Rule 4(c) Report.

In his original Rule 4(c) report, the Secretary challenged Mr. Webb's entitlement to compensation, stating that there was an absence of medical record or opinion in the record supporting petitioner's claim of a vaccine-injury. Resp't's Rep. at 10. More importantly, the respondent argued that the medical records

indicated that the onset of Mr. Webb's claimed injury occurred two months before the administration of his flu vaccine on November 20, 2018. Id. at 11. For these reasons, the Secretary requested that the undersigned find that the case was not appropriate for compensation and dismiss the petition. Id. at 12.

During the Rule 5 status conference, the petitioner requested 30 days to consider his next steps. Order, issued Apr. 26, 2016. Mr. Webb was ordered to file a status report by May 26, 2016, stating how he would like to proceed. Petitioner requested multiple enlargements of this deadline, indicating that the delay was due to his attempt to obtain additional medical records that may explain the timeline of petitioner's complaints in relation to the vaccination. See order, issued June 28, 2016.

On July 20, 2016, Mr. Downing moved to withdraw from the case. On August 25, 2016, Mr. Webb filed a letter stating that he was proceeding pro se. On October 1, 2016, petitioner moved for leave to file an amended petition. Petitioner's motion was granted and he was given until December 16, 2016, to file the amended petition. Order, issued Nov. 3, 2016. At the same time, Mr. Downing's motion to withdraw as Mr. Webb's attorney was granted. Order, issued Nov. 2, 2016.

While Mr. Webb worked to obtain additional records, he requested several enlargements of time to file his amended petition. During this time, Mr. Webb also filed various motions to exclude information related to his criminal history from the record. See Pet'r's Mot. to Exclude, filed Aug. 9, 2017; Pet'r's Mot. to Strike, filed Aug. 9, 2017; Pet'r's Rule 403 Mot., filed Aug. 9, 2017. These motions were denied on January 22, 2018.

Mr. Webb ultimately filed his amended petition on October 4, 2017. A status conference was held on March 20, 2018, to discuss the amended petition and petitioner's next steps. During the status conference, the petitioner indicated that he had been unable to obtain an independent neurological examination and expressed an interest in the undersigned appointing one to examine him. See order, issued March 22, 2018. The undersigned noted that Mr. Webb could move for the appointment of an independent neurologist, but that it was unlikely that the Office of Special Masters would be able to make such an arrangement. Id. Mr. Webb also requested and was granted leave to file additional medical articles regarding his condition and / or his claim of causation. Id. The undersigned also ordered the Secretary to file a supplemental Rule 4(c) report within 60 days, addressing the newly filed medical records and Mr. Webb's amended petition. Id.

On June 4, 2018, the Secretary filed his supplemental Rule 4(c) report, noting that the additional exhibits, medical records, and averments made in the amended petition did not "cure the factual discrepancies and legal insufficiencies" of Mr. Webb's claim. Resp't's Rep. at 4. Concurrent with the filing of the Rule 4(c) report, the Secretary moved for Mr. Webb's claim to be dismissed, stating that the action had been pending for three years, during which time petitioner has been unable to support the claim with reliable evidence. Resp't's Mot. to Dismiss, filed June 4, 2018, at 1. Mr. Webb responded, stating that dismissal was not appropriate and that he had met the statutory requirements for compensation. Pet'r's Resp., filed June 25, 2018, at 1-2. The pending motion is ripe for adjudication.

## II.   Background

The parties to this case take two different points of view with regards to when Mr. Webb's Bell's palsy first manifested on the left side of his face. While Mr. Webb has filed evidence in the form of his affidavits, medical records, and other supporting documents covering a period of nearly a decade, the focus for this decision is the period between September and December 2012. The crux is whether Mr. Webb's left-sided Bell's palsy started before, or following, his flu vaccination on November 20, 2012. Accordingly, the restatement of the facts of this case are largely limited to that period.

### A. Medical Records[2]

Mr. Webb had a history of Bell's palsy on the right side of his face prior to the November 20, 2012 flu vaccine. See exhibit 3 at 44. The palsy first appeared in Mr. Webb's medical records on November 5, 2011. Exhibit 3 at 44. This was two weeks *before* Mr. Webb received a seasonal flu vaccination on November 22, 2011 (the year before the vaccination in question).

Over the course of the next year, Mr. Webb noticed improvement in the right-sided Bell's palsy. Id. at 36. During this time, he visited the health care staff for other medical and psychological complaints that are not pertinent to the present issue. See generally exhibit 3.

---

[2] Mr. Webb is a prisoner in custody of the Arizona Department of Corrections (ADOC). Before being placed in custody with ADOC, he was jailed by Maricopa County. Thus, many of his records arise out of requests for medical treatment submitted by Mr. Webb to the institution.

In the fall of 2012, the records show that Mr. Webb made some routine visits to the health center. On October 9, 2012, he was seen to have his blood pressure measured. Id. at 33. This visit was due to a request made by Mr. Webb on a Health Needs Request. See exhibit 9 at 6. Some short notes accompany this record, stating that he "has no concerns / complaints" and that he was "in [0] distress." Exhibit 3 at 33. Mr. Webb was also seen for blood draws on November 12, 2012, and November 13, 2012. Id. The records made by the technicians that performed these blood draws do not show any complaints by Mr. Webb. Id.

During the fall of 2012, Mr. Webb also made several other Health Needs Requests. See exhibit 9. In three of these requests, he asked for tape for the purpose of addressing symptoms from his Bell's palsy; the tape is used to keep his affected eye shut so that he can sleep. In the needs request on October 19 and 29, 2012, Mr. Webb stated that he needed the tape for his "eye." Id. at 1, 4. In the October 24, 2012 request, Mr. Webb stated that he needed the tape for his "eyes." Id. at 2.

Mr. Webb received a seasonal flu vaccine on November 20, 2012. Exhibit 3 at 8-9.

Ten days after his flu vaccination, Mr. Webb visited the clinic again for a scheduled visit. Id. at 31. During this appointment, the records show that Mr. Webb stated that he had developed Bell's palsy on the *left* side of his face on September 21, 2012. Id. The records further state that his *right*-sided Bell's palsy was resolved. Id. Importantly, the records provide certain indicia in support of the timing provided. Specifically, the records state, accurately, that Mr. Webb was on trial on September 5, 2012, and that Mr. Webb believed that his Bell's palsy was secondary to the stress caused by the trial. Compare id. (noting that Mr. Webb's trial was on September 5, 2012) with exhibit 13 at 1 (Mr. Webb's calendar noting that his guilty verdict was delivered on that day). The records also state that the left-sided Bell's palsy has improved since September 2012. Exhibit 3 at 31. Because of the importance of this record to this decision, the document is reproduced below:

| Date: 11/30/12   Time: 1130 | |
|---|---|
| Chief Complaint/HPI: *handwritten text* | |
| Exam: | |
| General Appearance: | |
| Skin: | |
| HEENT/Dental: | |
| Heart: | |
| Lungs: | |
| Breasts: | |
| Abdomen: | |
| GU/Pelvic: | |
| Back/Extremities: | |
| Neuro: | |
| Lab/Studies reviewed with patient: | |

Id.

In the following years, Mr. Webb's medical records show that his symptoms
associated with the Bell's palsy gradually improved. In December 2012, he was
unable to close his left eye. Exhibit 3 at 37. In March 2013, he had a slight droop
in his right jaw. Exhibit 5 at 185. By March 2014, he had only slight pain and
scant facial paralysis. Exhibit 5 at 178.

## B. Mr. Webb's Affidavits and other records

Mr. Webb submitted several exhibits that conveyed his personal recollection
of events surrounding his reaction to the November 20, 2012 flu vaccine.

In his original affidavit, Mr. Webb stated that his right-sided Bell's palsy
started in early November 2011. Exhibit 1 at ¶ 8. He stated that his Bell's palsy
improved throughout the year, though he continued to experience temporary flare-
ups of his symptoms. Id. at ¶ 13-15.

Mr. Webb stated that after he received his flu vaccine on November 20,
2012, he began experiencing Bell's palsy symptoms on the left side of his face. Id.
at ¶ 17. He expressed that the onset was very similar to his experience with the
right side of his face a year earlier. Id.

Mr. Webb further averred that he set up an appointment with Correctional
Health Services because he was concerned about the onset of Bell's palsy

symptoms on the left side of his face. Id. at ¶ 18. This appointment took place on November 30, 2012, and resulted in the record reproduced above. The November 30, 2012 appointment is not further described in Mr. Webb's first affidavit.

In the affidavit filed concurrently with his amended petition, Mr. Webb stated that it was after the November 21, 2012 flu vaccine that he started experiencing the onset of symptoms he attributed to Bell's palsy. Exhibit 10 at ¶ 1. Mr. Webb described the onset of the pain in some detail. See id. at ¶ 2. Mr. Webb stated that the facial paralysis was first noticed on the morning of November 28, 2012. Id. at ¶ 6. He stated that he is sure of the timeline because he remembers being concerned about his appearance for his upcoming sentencing on December 5, 2012. Id. at ¶ 7. In this affidavit, Mr. Webb does not address the November 30, 2012 medical appointment.

In a separate affidavit, filed as exhibit 14, Mr. Webb addressed the November 30, 2012 visit in more detail. In this affidavit he stated that the physician assistant "made a medical records blunder." Exhibit 14 at ¶ 1. Mr. Webb controverted his previous averment that the November 30, 2012 visit was scheduled in response to the onset of Bell's palsy on the left side of his face following the November 20, 2012 vaccination. See exhibit 1 at ¶ 18. Here, he acknowledged that the appointment was for a "scheduled chronic care visit for hypertension and chronic kidney disease." Id. He further stated that when he saw the physician assistant, Mr. Webb told him about the symptoms he had been experiencing on the left side of his face. Id. at ¶ 2-4. However, Mr. Webb argued that the physician assistant made a series of blunders in documenting Mr. Webb's concerns into the record. Id. at ¶ 5-8.

More specifically, Mr. Webb stated that the documentation that the left-sided Bell's palsy started on "9/21/18," should read "11/21/18." Id. at ¶ 5. Mr. Webb further argued that when the treater wrote "notes improvement [left] side face since Sept. 2012," the physician assistant had confused the month of September from Mr. Webb's statement that he was found guilty in September. Id. Mr. Webb argues that the note "means that the extreme pain had abated or improved since it had started on what should have been annotated 11/21/12." Id. (internal quotations omitted).

Mr. Webb also pointed out that he did not request treatment for the onset of Bell's palsy in the fall of 2012 in any of the submitted Health Needs Requests. Id. at ¶ 6. He also noted that the records of the technicians that checked his blood pressure and drew his blood on October 9, November 12, and November 13, did

not indicate that anything was wrong or that Mr. Webb had any complaints. Id. at ¶ 6 (referencing exhibit 3 at 33). In his affidavit, Mr. Webb also pointed out that in the Health Needs Requests for tape, he usually used the singular "eye" and that the one time he used the plural "eyes" was a typographical error that he recalled making and recalled deciding not to fix at the time. Exhibit 14 at ¶ 7 (referencing exhibit 9).

In addition to his affidavits, Mr. Webb submitted other exhibits such as a pain journal (exhibit 11) and a medical visit log (exhibit 20). These largely concerned a time period that is not critical for the purposes of this decision. However, exhibit 13 is an annotated calendar detailing his recall of symptoms following the 2012 vaccination. The calendar is consistent with the contents of the affidavits and is not further summarized here.

## C. The Secretary's Argument

In his motion to dismiss, the Secretary argues that Mr. Webb is not entitled to compensation for he has failed to meet his burden of proving causation. Resp't's Mot., filed June 4, 2018, at 1 (incorporating the arguments made in the concurrently filed supplemental Rule 4(c) report). The Secretary argues that Mr. Webb's claims are controverted by the medical records insofar as the onset of his left-sided Bell's palsy preceded the 2012 flu vaccination and there is no evidence in the record supporting the injuries alleged in Mr. Webb's amended petition. See Resp't's Rule 4(c) Rep., filed June 4, 2018, at 4-5. The Secretary notes that the action has been pending for three years, during which time Mr. Webb has been unable to support his claim with reliable evidence. Resp't's Mot., filed June 4, 2018, at 1.

## D. Mr. Webb's Argument

Mr. Webb responded to the Secretary's motion, stating that he had met his burden by a preponderance of evidence. Pet'r's Resp., filed June 25, 2018, at 1. Mr. Webb criticizes the respondent's reliance on a single medical record to conclude that Mr. Webb's Bell's palsy manifested before the vaccination in question. Id. at 2. Mr. Webb argues that he has presented preponderant evidence to show that the medical record in question is a "medical records blunder" and that because of his confinement in prison, he has been "prevented beyond his control to see a medical expert." Id. at 2-3. Mr. Webb further argues that he has satisfied his burden to show a compensable vaccine injury under the Vaccine Act, as it has been interpreted by the Federal Circuit. Id. at 4-6.

### III.   Standards of Adjudication

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The Secretary's motion turns on a factual determination that Mr. Webb's Bell's palsy on the left side of his face occurred prior to the administration of his flu vaccine on November 20, 2012. The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all of their problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete. A notable example is Cucuras in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. Cucuras, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of

seizures a week after they in fact occurred." Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions by judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity"), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims listed four such explanations. The Court noted that inconsistencies can be explained by: (1) a person's failure to recount to the medical

professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony. Cucuras, 993 F.2d at 1528. Oral and written testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993). However, compelling testimony may be more persuasive than written records. Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted).

## IV.  Analysis

### A. Mr. Webb's Original Claim: Bell's Palsy

Although Mr. Webb argues that the medical record of November 30, 2012 was a "medical records blunder," on balance the undersigned finds the November 30, 2012 medical record to be the most reliable evidence of when Mr. Webb's left-sided Bell's palsy started. The other evidence presented by Mr. Webb is, at best, equivocal. In contrast, the November 30, 2012 record is precise, cogent, and clear.

The November 30, 2012 record does not lend itself to the conclusion that it is not an accurate account of what Mr. Webb reported at the time. Of all his medical records, the record is relatively complete and comprehensive. The record is also internally consistent and creates a narrative of events that is tied to other events in Mr. Webb's life.

11

Mr. Webb's argument that the treater mistakenly wrote September instead of November is not persuasive for two reasons. First, the treater created a narrative in which Mr. Webb's stress due to the guilty verdict on September 5, 2012, may have been causally associated with the onset of his Bell's palsy two weeks later. This same notation does not make sense if the treater meant to write that the onset was "11/21/12" instead of "9/21/12." Second, the treater made a second notation that Mr. Webb had noted improvement since "Sept. 2012." The argument that a treater mistakenly wrote an "11" instead of a "9" is a stretch, but conceivable. The argument that a treater wrote an "11" instead of a "9" and "Sept." instead of "Nov." is much less persuasive.

Mr. Webb is correct that other records inform his claim that the vaccination pre-dated the onset of his left-sided Bell's palsy. The fact that the left-sided palsy was not noted in visits to get his blood pressure checked and his blood drawn in October and November 2012 is relevant and probative. Nonetheless, these records are easily explained by two observations. First, these appointments were for the purpose of running specific tests performed by technicians and were not physical examinations or an attempt to collect medical history. In contrast, this was the case for the November 30, 2012 appointment. Second, the fact that Mr. Webb did not complain about his Bell's palsy at these appointments to have his blood drawn and blood pressure taken is entirely consistent with Mr. Webb's testimony that he did not think that anything could be done and that he had self-diagnosed the issue as the same Bell's palsy that had occurred on the right side of his face a year prior. See exhibit 14 at ¶ 2 ("I did not put in a Health Needs Request because there was nothing that could be done").

The Health Needs Requests that Mr. Webb *did* file that fall are relevant as well. However, their evidentiary value is minimal, at best. Mr. Webb's argument that the fact that two of the three records refers to "eye" in the singular as opposed to the plural rests on the assumption that the one record that uses the plural was a typo, as Mr. Webb suggests. However, the undersigned cannot credit Mr. Webb's averment that he remembers making the typographical error; recalling a typo years later strains reason. Even more, the evidence in the record indicates that by October 2012, Mr. Webb's right-sided Bell's palsy had largely resolved and thus the tape could have been just for his left eye. Regardless, the undersigned finds the singular / plural distinction in these records to be especially unhelpful for resolving the factual question at bar.

Also potentially relevant is the *absence* of Health Needs Requests or other indications that Mr. Webb sought treatment for Bell's palsy in September or

October 2012.  Mr. Webb argues that this buttresses his claim of a later onset. However, Mr. Webb's decision to not solicit treatment for the left side Bell's palsy is, as noted before, consistent with Mr. Webb's statement that he did not believe anything could be done and was intent to let the palsy run its course without medical treatment.  See exhibit 14 at ¶ 2 ("I did not put in a Health Needs Request because there was nothing that could be done").

Furthermore, Mr. Webb's argument that he would have sought treatment for left-sided Bell's palsy is inconsistent with even Mr. Webb's version of events. More specifically, Mr. Webb claims that the left-side Bell's palsy started on November 21, 2012, with intense pain and was followed by facial paralysis on November 28, 2012.  To the extent that Mr. Webb is correct in saying that he would have sought treatment in September if the onset actually occurred in September, we would also expect him to have sought treatment in November if the onset occurred in November.  However, Mr. Webb did not report the intense pain or the paralysis when the symptoms occurred, instead nothing was mentioned until a previously-scheduled visit approximately 10 days later.

Finally, the undersigned notes that while Mr. Webb is confident in his ability to recall events from 2012 with incredible specificity (for example, as noted above, Mr. Webb avers that he can recall making a typographical error on a health needs form), the evidence in this case shows that Mr. Webb's memory is not as perfect as he may think.  In his original affidavit, Mr. Webb claimed that the onset of his Bell's palsy symptoms following the November 20, 2012 vaccination prompted him to fill out a Health Needs Request, with complaints about pain and paralysis on the left side of his face.  Exhibit 1 at ¶ 18.  However, Mr. Webb later acknowledged that he was mistaken; the November 30, 2012 appointment was a previously scheduled six-month chronic care visit for his hypertension.  Am. Pet. at ¶ 7.

In summary, the undersigned finds it more likely than not that Mr. Webb's Bell's palsy started on or around September 21, 2012.  Accordingly, his claim that the November 20, 2012 flu vaccine caused the injury cannot prevail.

## B. Mr. Webb's Additional Claims

Mr. Webb amended his petition to include a claim that the flu vaccine he received on November 20, 2012 caused him to have an anaphylactic reaction, followed by bilateral trigeminal neuralgia, fibromyalgia, and a chronic

inflammatory demyelinating polyneuropathy.  Am. Pet. at 2.  Mr. Webb did not allege significant aggravation.

As an initial matter, the undersigned notes that in his amended petition, Mr. Webb continues to associate the onset of these symptoms to his reaction to the November 20, 2012 vaccination.  Thus, the finding that Mr. Webb's facial paralysis began in September 2012 undermines his claims of vaccine causation for the injuries alleged in the amended petition as well.

Furthermore, Mr. Webb has not met his burden of showing that he suffers from the injuries alleged in the amended petition.  The Federal Circuit has stated that "the statute places the burden on the petitioner to make a showing of at least one defined and recognized injury."  Lombardi v. Sec'y of Health & Human Servs., 656 F.3d 1343, 1353 (Fed. Cir. 2011).  Put another way, if a petitioner cannot prevail on showing that he suffers from his alleged injury, that ends the analysis.  See Hibbard v. Sec'y of Health and Human Servs., 698 F.3d 1355, 1365 (Fed. Cir. 2012).

Here, the medical records simply do not sustain a claim that Mr. Webb suffered any of the alleged injuries with the exception of Bell's palsy.

Throughout the records from 2016 and 2017, Mr. Webb complained he was suffering from some alternate, or underlying, condition other than the Bell's palsy with which he had already been diagnosed.  See, e.g., exhibit 23 at 2 (recording a May 16, 2017 visit where Mr. Webb reported that he "believes he has other neurological problems going on" and that he was "trying to connect his hypercalcemia and facial paralysis to a possible neurological problem other than the Bell's palsy"); exhibit 23 at 5 (Mr. Webb "requesting to see a neurologist for multiple complaints" on March 3, 2017); exhibit 22 at 8 (recording a November 9, 2016 visit where Mr. Webb told his physician to "forget about the Bells Palsy" and requesting a neurology consultation because he is "concerned that further demyelination of his nerves will continue or that he has a tumor and that is why he wants to have  the neurology consult").

However, the record simply does not sustain a finding that Mr. Webb suffers from a neurological condition beyond Bell's palsy.  Despite the numerous complaints and evaluations, Mr. Webb's treating physicians appear to have universally concluded that Mr. Webb suffered from a waning course of Bell's palsy and had no other underlying neurological condition.  See, e.g., exhibit 22 at 8 (assessing Mr. Webb with a facial nerve disorder); exhibit 22 at 16 (assessing Mr.

Webb with "old Bell's palsy"); exhibit 23 at 2 (noting that Mr. Webb had "no new neurological symptoms" and assessing him with Bell's palsy with chronic symptoms that are improved); exhibit 16 at 1 (cancelling Mr. Webb's request for an off-site neurological examination following examination by his treating physician). Accordingly, the evidence Mr. Webb presented falls short of his statutory requirement to present preponderant evidence of the injury he alleged in the amended petition.

Relatedly, Mr. Webb has indicated that he would like the undersigned to designate, and arrange for, a court-appointed neurologist to independently examine Mr. Webb. See order, issued Mar. 22, 2018. As an initial matter, the undersigned has doubts about his jurisdiction to offer Mr. Webb the relief he requests. Regardless of the answer to that jurisdictional issue, the undersigned does not find that a court-appointed neurologist is appropriate here. Mr. Webb's medical records indicate that he has been examined by multiple healthcare providers and all have come to the same conclusion regarding Mr. Webb's clinical course. Nothing in the record, beyond Mr. Webb's recent averments otherwise, contradicts the findings of Mr. Webb's physicians or otherwise undermines the credibility of those physicians.

In addition, the undersigned notes that the onset of Mr. Webb's claimed neurological symptoms occurred months prior to the flu vaccine he received in November 2012. This factual issue regarding the onset logically precludes the claim that any neurological symptoms that Mr. Webb may have had are the result of an adverse reaction to the vaccine. W.C. v. Sec'y of Health & Human Servs., 704 F.3d 1352, 1358 (Fed. Cir. 2013) ("If a petitioner has a disorder before being vaccinated, the vaccine logically cannot have caused the disorder"). Thus, to whatever extent Mr. Webb may actually benefit from the services of an independent neurologist (despite his physicians' opinions otherwise) it does not appear that an outside neurologist would be able to provide probative evidence for Mr. Webb's petition.[3] For the aforementioned reasons, Mr. Webb's request for a court-appointed neurologist is denied.

---

[3] Mr. Webb's October 4, 2017 Amended Petition alleges he suffered various injuries that were "the result from an adverse effect" of the flu vaccination. The Amended Petition does not allege significant aggravation.

### C. A Hearing is Not Necessary for the Adjudication of Mr. Webb's Petition

The undersigned has determined that Mr. Webb's claim can be dismissed without a hearing to take Mr. Webb's oral testimony.

In D'Tiole v. Sec'y of Health & Human Servs., the Federal Circuit stated that "the decision to hold an evidentiary hearing is statutorily committed to the discretion of the Special Master." 726 F. App'x 809, 812 (Fed. Cir. 2018) (citing 42 U.S.C. § 300aa-12(d)(3)(B)(v)). This discretion is tempered by Vaccine Rule 3(b)(2) and Vaccine Rule 8. Vaccine Rule 3(b)(2) requires special masters to "afford[] each party a full and fair opportunity to present its case." Vaccine Rule 8(d) authorizes a special master to "decide a case on the basis of written submissions without conducting an evidentiary hearing."

As an initial matter, the documentary record appears complete. For the first year this case was pending, a capable and experienced attorney represented Mr. Webb. On Mr. Webb's behalf, Mr. Downing submitted records and affidavits relating to his claim during that time. Furthermore, after Mr. Downing's withdrawal, Mr. Webb has shown himself capable of filing additional records and other supporting documentation. He has also amended his petition. Thus, the documentary part of the case is sufficient.

The remaining question is whether oral testimony is also needed. Based upon "the specific circumstances" (Vaccine Rule 8(a)), the undersigned finds that taking oral testimony is not required to adjudicate Mr. Webb's claim fairly. In the undersigned's experience, hearings prove helpful when records contain ambiguities or when a record appears missing. However, here, those circumstances are not present. The medical records from 2012 are consistent and complete.

The consistency of the medical records stands in contrast with Mr. Webb's affidavits. Mr. Webb's statements have been internally inconsistent and appear opportunistic insofar as the averments have, over time, shifted to comport with the medical records. These changes in written testimony lessen the likelihood of receiving reliable testimony at a hearing.

Finally, Mr. Webb has offered no supporting affiants that substantiate his claims to weigh against a finding that a hearing is appropriate. In the undersigned's experience, oral testimony from third-parties can be helpful, but Mr. Webb has not identified any potential percipient witnesses.

Accordingly, in consideration of the specific circumstances of Mr. Webb's case, the undersigned finds an adjudication without a hearing appropriate.

## V.   <u>Conclusion</u>

For the aforementioned reasons, the undersigned finds that Mr. Webb has been provided a full and fair opportunity to present his case of a vaccine injury. The evidence entered by Mr. Webb is not sufficient to meet his statutory burden for proving a compensable vaccine injury. Accordingly, Mr. Webb's petition is DISMISSED pursuant to Vaccine Rule 8(d).

**IT IS SO ORDERED.**

Christian J. Moran
Special Master